UNITED STATES DISTRICT COURT                    b
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

JACOB GAUTRO                          CIVIL ACTION NO. 1:15-CV-02013

VERSUS                                JUDGE TRIMBLE

CAROLYN W. COLVIN                     MAGISTRATE JUDGE PEREZ-MONTES

---

## REPORT AND RECOMMENDATION

Jacob Norman Gautro ("Gautro") filed an application for supplemental security income ("SSI") on April 27, 2011 (protective filing date), due to "depression, ADD, anxiety disorder, OCD," alleging a disability onset date of March 1, 2011 (Doc. 10-1, p. 172, 191/613).  Gautro was 19 years old when he filed his application (Doc. 10-1, p. 88, 172/613).

A hearing was held on April 2, 2012, at which Gautro appeared with a witness and a vocational expert ("VE") (Doc. 10-1, p. 33/613).  The ALJ found that Gautro suffers from severe impairments of major depression and personality disorder (Doc. 10-1, pp. 105-6/613).  The ALJ found that Gautro has the residual functional capacity to perform the full range of work at all exertional levels, but with nonexertional limitations of no complex work, working with things rather than with people, and his interaction with the public, co-workers, and supervisors must be no more than occasional (Doc. 10-1, pp. 105-6/613).  The ALJ concluded there are jobs that exist in significant numbers in the national economy that Gautro can perform, such as assembler and hand packager and, therefore, Gautro was not disabled at any time through the date of his decision on May 8, 2012 (Doc. 10-1, pp. 109-110/613).

In April 2013, the Appeals Council reviewed Gautro's case and found Gautro had failed to appear for the hearing, but his mother, Arsane Gautro, appeared, signed a waiver of representation form on his behalf, and testified (Doc. 10-1, p. 116/613). The Appeals Council remanded the case to the ALJ with instructions to determine if Gautro's mother is his legally appointed representative or payee and, if she is, to determine whether Gautro constructively waived his right to appear at the hearing and to issue a "notice to show cause" why the claimant did not appear, all prior to issuing a decision (Doc. 10-1, p. 116/613). The Appeals Council further instructed that, if the ALJ found the mother was not the legally appointed representative and Gautro did not appear for his hearing despite returning the acknowledgment card, the ALJ could dismiss his request for hearing as abandoned (Doc. 10-1, p. 116/613). The ALJ was also instructed to offer Gautro an opportunity for a hearing (Doc. 10-1, p. 117/613).

A second hearing was held on October 15, 2013, at which Gautro appeared with his attorney, a VE, and a witness (Doc. 10-1, p. 51/613). The ALJ found that Gautro has not engaged in substantial gainful activity since April 27, 2011 and has severe impairments of schizophrenia, major depression, and a personality disorder (Doc. 10-1, p. 19/613). The ALJ further found that Gautro has the residual functional capacity to perform the full range of work at all exertional levels, but has nonexertional limitations of work requiring no more than one to three-step instructions, only occasional interaction with the public, co-workers, and supervisors, and working with things rather than with people (Doc. 10-1, p. 21/613). The ALJ concluded that Gautro

was not disabled at any time through the date of his decision on November 27, 2013 (Doc. 10-1, p. 26/613).

Gautro requested review of the ALJ's decision, but the Appeals Council declined to review it (Doc. 10-1, p. 6/613), and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Gautro then filed this appeal for judicial review of the Commissioner's decision. Gautro raises the following grounds for relief in his appeal (Docs. 14 & 18):

1.  The ALJ's hypothetical question to the VE was defective because he failed to include limitations caused by Gautro's mental impairments.

2. The ALJ's determination that Gautro can perform alternate work activity does not comport with proper legal standards because he failed to find that Gautro can hold and maintain a job for a significant period of time.

3. The ALJ did not follow agency regulations in assessing the severity of Gautro's mental impairments.

4. The two jobs identified by the VE require skills excluded by the ALJ's hypothetical questions.

<u>Eligibility for SSI Benefits</u>

To qualify for SSI benefits, a claimant must file an application and be an "eligible individual" as defined in the Act.   42 U.S.C. § 1381(a).   Eligibility is dependent upon disability, income, and other financial resources.   42 U.S.C. § 1382(a).  To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than 12 months.   Plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy. 42 U.S.C. § 1382(a)(3).  The earliest

3

month for which an eligible SSI claimant can receive benefits is the month following the month his application was filed, 20 C.F.R. § 416.335, or the month following the month during the pendency of the application that the claimant meets all the eligibility requirements, 20 C.F.R. § 416.330(a).

Scope of Review

In considering Social Security appeals, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors.  See McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999).  For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance.  See Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)).  Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence that support the Commissioner's decision, but must include a scrutiny of the record as a whole.  The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight.  See Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder.  See Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983).  The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court.  See Allen v. Schweiker, 642

4

F.2d 799, 801 (5th Cir. 1981); see also Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992). The court does have authority, however, to set aside factual findings that are not supported by substantial evidence and to correct errors of law. See Dellolio, 705 F.2d at 125. However, to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." See Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

Summary of Pertinent Facts

1. Records

Gautro has a twelfth grade education and past work as a sales associate at Walmart (July-September 2010) and as a corrections officer (two days in 2010) (Doc. 10-1, pp. 192-93/610).

Gautro was evaluated by psychologist William B. Daigle, Ph.D. in 2001, when he was nine years old. Dr. Daigle noted Gautro's previous evaluation in 2000 by Dr. John DeBack, Jr., M.D., who diagnosed ADHD, NOS and prescribed Ritalin (Doc. 10-1. P. 180/613). Dr. DeBack suspected an underlying learning disorder as well (Doc. 10-1, pp. 280-281/613). Dr. Daigle found that Gautro's verbal IQ was in the high average range, his performance IQ was in the borderline mentally deficient range, and his full scale IQ was in the average range (Doc. 10-1, pp. 281-282/610). Dr. Daigle found that Gautro had strong verbal reasoning skills and generally solid skills in areas of academic achievement. However, Dr. Daigle concluded that Gautro met the criteria for Learning Disorder NOS because his learning process was substantially

impaired by deficits in visual-perceptual reasoning and visual-perceptual speed (Doc. 10-2, pp. 185-86/613).   Due to his learning disorder, Gautro was eligible for accommodations and modifications in his education (Doc. 10-2, p. 286/613).   Dr. Daigle also recommended ADHD medication and tutoring (Doc. 10-1, p. 286/613).

In January 2003, eleven-year-old Gautro had a pediatric neurology evaluation by Dr. Lily Hsu for his inattentiveness (Doc. 10-1, p. 287/613).   Gautro was in the fourth grade and making B's and C's with significant help from the teachers (Doc. 10-1, p. 287/613).   Gautro had begun having crying spells due to too much work, his appetite had decreased, he was irritable, and he had low self-esteem, but he did not have anxiety problems (Doc. 10-1, p. 287/613).   Gautro's mother reported that he began obsessive behavior a year ago, such as frequent checking to see if doors were closed, checking the lights three or four times, and washing due to fear of germs (Doc. 10-1, p. 188/613).   Jacob was 5 feet tall, weighed 158 pounds, and his blood pressure was 102/60 (Doc. 10-1, p. 288/613).   Gautro was  diagnosed with ADHD, inattentive type, a possible visual processing problem, mild obsessive-compulsive disorder, and mild depression versus dysthymia (Doc. 10-1, p. 188/613).   Dr. Hsu recommended school accommodations, discontinued Concerta (for ADHD) due to side effects, and prescribed Strattera (Doc. 10-1. Pp. 348-49/610).

In 2010, Gautro was taking Celexa for depression and insomnia (Doc. 10-1, pp. 291-292/613).   Gautro weighed 251 pounds and his blood pressure was 120/84 (Doc. 10-1, pp. 292-93/613).

In February 2011, Gautro had a mental evaluation at the Avoyelles Mental Health Clinic and was diagnosed with depressive disorder NOS at Axis I; borderline intellectual functioning versus low average at Axis II; a history of ADHD at Axis III; unemployment at Axis IV; and a current GAF of 60 at Axis V (Doc. 10-1, pp. 296-97).[1] Additional testing was recommended (Doc. 10-1, p. 296/613).  Gautro was prescribed Paxil, Vistaril, and Buspar (Doc. 10-1, p. 312/613).

On July 26, 2011, Gautro was taken to the emergency room because he expressed a desire to kill himself and it was believed he had ingested "legal weed"

---

[1] The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client.  Axis I refers to clinical syndromes, Axis II to developmental disorders and personality disorders, Axis III to physical disorders and conditions, Axis IV to psychosocial stressors, and Axis V to the global (overall) assessment of functioning.  See Diagnostic and Statistical Manual of Mental Disorders, Text Revised, pp. 25-35 (4th ed. 2000) ("DSM-IV-TR").

The Global Assessment of Functioning, or GAF, score represents Axis V of the Multiaxial Assessment system.  See Diagnostic and Statistical Manual of Mental Disorders, Text Revised, pp. 25-30 (4th ed. 2000) ("DSM-IV-TR").  GAF is a standard measurement of an individual's overall functioning level. The GAF score is a subjective determination that represents the clinician's judgment of the individual's overall level of functioning with respect to psychological, social and occupational functioning, on a hypothetical continuum of mental health-illness.  The first number indicates the patient's current GAF, while the second number indicates the highest score reported in the previous year.  See DSM-IV-TR at 32-34.  The GAF scale goes from 0-100: 91-100 - superior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities, no symptoms; 81-90 - absent or minimal symptoms, good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns; 71-80 - if symptoms are present, they are transient and expectable reactions to psycho-social stressors,  not more than slight impairment in social, occupational, or school functioning; 61-70 - some mild symptoms OR some difficulty in social, occupational or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships; 51-60 - moderate symptoms OR moderate difficulty in social, occupational, or school functioning; 41-50 - serious symptoms OR serious impairment with social, occupational, or school functioning; 31-40 - some impairment in reality testing or communication OR major impairment in several areas such as work or school, family relations, judgment, thinking, or mood; 21-30 - behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgement OR inability to function in almost all areas; 11-20 - some danger of hurting self or others OR occasionally fails to maintain minimal personal hygiene OR gross impairment in communication; 1-10 - persistent danger of severely hurting self or others OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death; and 0 - inadequate information.  See DSM-IV-TR, at 34; see also, Boyd v. Apfel, 239 F.3d 698 (5th Cir. 2001).

and vodka (Doc. 10-1, p. 318/613), but a toxicology screen was negative (Doc. 10-1, p. 351/613).  Gautro did not drink alcohol or use drugs (Doc. 10-1, p. 317/613).  Gautro did not recognize his parents and thought he was dead (Doc. 10-1, pp. 316, 326/613). A CT scan of Gautro's brain showed a tiny focus of increased density present in the right parieto occipital junction region, but the scan was "probably normal" (Doc. 10-1, p. 340/613).    Gautro was diagnosed with depression, suicidal ideation, hallucinations, and visual hallucinations (Doc. 10-1, p. 338/613).  Gautro was believed to have had an acute psychotic reaction to his medications (Doc. 10-1, p. 351/613). Gautro was discharged on July 29, 2011 (Doc. 10-1, p. 325/613), and was prescribed Atarax, Buspar, and Paxil (Doc. 10-1, p. 331/613).

On July 30, 2011, Dr. Glenn Futch, Ph.D., evaluated Gautro (Doc. 10-1, p. 306/613).   Gautro complained of depression, anxiety, an inability to control his behavior, needing to flip light switches back and forth because he's afraid the house might catch on fire if he does not, needing to check the refrigerator and sink over and over, and asking Jesus for forgiveness over and over (Doc. 10-. P. 307/613).  Dr. Futch noted that Gautro lived by himself in a mobile home on his parents' property, cooked simple meals, shopped for food and clothes, completed household chores, and drove (Doc. 10-1, p. 307/613).  Gautro's daily routine included sleeping until noon, talking to his girlfriend, playing video games, doing yard work, working out with weights, and fixing old bicycles (Doc. 10-1, p. 3008/613).  Gautro reported problems interacting with people, preferring to be by himself, being able to complete tasks when alone but having difficulties doing so in the company of others due to self-consciousness, and

8

being able to walk away before acting out aggressively when angered (Doc. 10-1, p. 308/613). Gautro did not have any problems standing, walking, or lifting heavy objects (Doc. 10-1, p. 307/613).

Dr. Futch found that Gautro appeared to functioning at the average range of intellectual ability, and his judgment and insight appeared to be within normal limits (Doc. 10-1, p. 309/613). Dr. Futch diagnosed major depressive disorder, recurrent and moderate, and obsessive-compulsive disorder (provisional) at Axis I (Doc. 10-1, p. 309/613). Dr. Futch stated that Gautro appeared to suffer from chronic episodes of moderate depression that had persisted since childhood and obsessive-compulsive disorder, as evidenced by intrusive thoughts and compulsive behavior (Doc. 10-1, p. 309/613). Treatment with psychotropic medication and counseling had produced minimal results, so Dr. Futch recommended cognitive behavioral therapy to improve self-esteem, coping skills, and depression (Doc. 10-1, p. 309/613). Dr. Futch further found that Gautro would probably remember and be able to follow routine, work-like procedures, carry out simple instructions, maintain attention to simple, repetitive tasks, had good anger management skills and appropriate social skills, would "likely be able to" adapt to changes in the work environment, and could set realistic goals, make plans, and independently manage funds (Doc. 10-1, pp. 309-310/613).

Gautro's psychological evaluation was updated on August 24, 2011 by Dr. Yolanda Rambin, Ph.D. (Doc. 10-1, p. 343/613). Dr. Rambin found Gautro produced a profile with a score pattern that was characteristic of an individual feigning a mental disorder (Doc. 10-1, p. 342/613). Dr. Rambin found that Gautro was feigning

a mental disorder, he might have recently used some synthetic marijuana or bath salts, his complaints of hearing voices were unlikely since his March 2011 psychological evaluation did not indicate psychosis, and he had not previously reported psychotic symptoms.  Dr. Rambin found Gautro has social anxiety and dependant personality features (Doc. 10-1, p. 343/613).  Dr. Rambin agreed with Gautro's current treatment plan (Doc. 10-1, p. 343/613).

In August 2011, Dr. Jack Spurrier, Ed.D., reviewed Gautro's medical records and concluded that Gautro suffers from severe affective disorder and severe personality disorder, and has a mild restriction of activities of daily living, and has moderate difficulties in maintaining social functioning (Doc. 10-1, p. 94/613).  Dr. Spurrier further found that Gautro's social limitations moderately limit his ability to interact appropriately with the general public, moderately limit his ability to accept instructions and respond appropriately to criticism from supervisors, moderately limit his ability to respond appropriately to changes in the work setting, moderately limit his ability to set realistic goals or make plans independently of others (Doc. 10-1, pp. 96-97/613).  Dr. Spurrier concluded that Gautro is able to work because, although his anxiety, depression, ADD, and OCD all contribute to his poor mental health, he retains a basic mental capacity to perform any number of simple occupations that require directions of 2 or 3 short, simple steps (Doc. 10-1, pp. 98-99/613).

In November 2011, Gautro was treated by Dr. Beau Brouillette at the Marksville Family Care Center for anxiety, depression, paranoia, and severe panic

attacks (Doc. 10-1, p. 360/613).   Gautro was diagnosed with a depressive type psychosis, for which he was taking Risperdal, and given a psychology referral (Doc. 10-1, p. 362/613).   In December 2011, Gautro was again seen for a follow-up and his Risperdal prescription was continued (Doc. 10-1, pp. 363-66/613).

In February 2012, Gautro, then age 20, was evaluated by medical psychologist Dr. James W. Quillin, Ph.D. for management of his psychiatric condition (Doc. 10-1, p. 351/613).   Gautro was referred to Dr. Quillin by Dr. Beau Brouillette (Doc. 10-1, p. 351/613).   Gautro described auditory hallucinations and episodes of smelling suphur and rotting material (Doc. 10-1, p. 351/613).   Gautro believed a demon was trying to hurt him (Doc 10-1, p. 351/613).   Dr. Quillin found Gautro is suspicious of others, engages in compulsive hand-washing (since childhood), compulsively flips light switches to make sure they are actually off, turns water on and off to make sure it is actually off, rechecks locks, and compulsively thinks about whether his socks or underwear are aligned correctly (Doc. 10-1, p. 351/613).   Gautro reported migratory aches and pains, depression, poor sleep, crying spells, episodic suicidal thoughts, passive death wishes, past auditory hallucinations, and diminished energy, interest level, and social interaction (Doc. 10-1, p. 351/613).

Dr. Quillin noted that Gautro was 6 feet tall and weighed 272 pounds (Doc. 10-1, p. 352/613).   Dr. Quillin stated that Gautro's intellectual function appeared to be low normal, his judgment was compromised clinically, and his insight was superficial to limited (Doc. 10-1, p. 352/613).   Dr. Quillin diagnosed probable schizoaffective

11

disorder,[2] psychosis NOS, and obsessive-compulsive disorder, and prescribed haloperidol, fluvoxamine, and lorazepam (Doc. 10-1, p. 352/613).

Two weeks later, Gautro was agitated, depressed, and highly anxious, and Dr. Quillin increased his Ativan, stopped the fluoxetine, and prescribed Cogentin, as well as lorazepam for agitation (Doc. 10-1, p. 354/613). Dr. Quillin diagnosed probable schizoaffective disorder and obsessive-compulsive disorder (Doc. 10-1. P. 354/613). Two weeks later, Gautro was much less agitated and doing better overall (Doc. 10-1, p. 3355/613). Dr. Quillin continued the Haldol and Cogentin, increased the Ativan, and added sertraline (Doc. 10-1, p. 355/613).

On March 15, 2012, Dr. Quillin wrote that Gautro was under his care for severe psychotic illness and would not be able to attend his scheduled SSI hearing (Doc. 10-1, p. 350/613). Gautro began seeing Tracy Regard, LCSW, a therapist, in July 2012 (Doc. 10-1, pp. 378-380/613).

In November 2012, Gautro was admitted to Ochsner Hospital for treatment of deep vein thrombosis ("DVT") in his left arm and was prescribed Coumadin (Doc. 10-1, pp. 405-413, 527-529/613). Dr. Mohit Srivastava monitored Gautro thereafter (Doc. 10-1, pp. 582-594/610). In April 2013, there was no evidence of DVT in Gautro's left arm (Doc. 10-1, p. 594/613).

---

[2] Psychotic disorders that affect thinking and perceptions, such as schizophrenia, are different from mood disorders, including depression and bipolar disorder, which primarily affect emotions. However, these disorders can occur together. Individuals who exhibit strong features of both schizophrenia and mood disorders are often given the hybrid diagnosis of schizoaffective disorder. See MEPLINEplus Health Conditions: Schizophrenia, **available at** https://ghr.nlm.nih.gov/condition/schizophrenia#synonyms (a service of the U.S. National Library of Medicine and the National Institutes of Health).

In March 2013, Dr. Srivastava examined Gautro because he fell and hit his head, causing neck and back pain (Doc. 10-1, pp. 560-581/613).   Dr. Srivastava diagnosed neck and back pain due to falling, and a head contusion (Doc. 10-1, p. 561/610).   In June 2013, Dr. Srivastava noted that Gautro was 5' 11" tall, weighed 299 pounds, and his blood pressure was 138/92 (Doc. 10-1, p. 557/613).   Gautro was diagnosed with mood disorder, fibromyalgia, and hypertension (Doc. 10-1, p. 557/613).

Dr. Quillin continued to treat Gautro for schizoaffective disorder and obsessive-compulsive disorder in 2012 and 2013 (Doc. 10-1, pp. 424, 426-436/613).   In April and September 2012, Dr. Quillin noted that Gautro was no longer hallucinatory, though he still had some paranoia (Doc. 10-1, pp. 433, 435/613).   In October 2012, Dr. Quillin noted that Gautro was doing great, his depression was under good control, he was not having headaches, and he was non-psychotic (Doc. 10-1, p. 432/613).

In May 2013, Gautro had an episode in which he "blew up" and tore up something (Doc. 10-1, p. 425/613).   Dr. Quillin noted that Gautro was given something like Ativan in the emergency room to calm him down, diagnosed with seasonal affective disorder and obsessive-compulsive disorder, prescribed Tileptal, and was told to continue taking Abilify, Ativan, and Celexa (Doc. 10-1, p. 425/613).

In May 2013, Gautro self-admitted to the Acadia Vermilion Hospital for six days (Doc. 10-1, p. 549/613).   Gautro stated he had been depressed since childhood, sleeps only two hours at night, has pain in his whole body, believes people are out to harm him all the time, and had been medication non-compliant due to a recent change in medications that caused adverse side effects (Doc. 10-1, p. 549/63).   Gautro was

evaluated by Dr. Jerry Sanders, who diagnosed: major depression with psychosis at Axis I; chronic mental illness at Axis IV; and a GAF of 30 on admission (Doc. 10-1, pp. 421, 440-443, 549-551/613).   Dr. Sanders prescribed Cymbalta, Invega, Restoril, and Clonidine (Doc. 10-1, p. 551/613).   Dr. Sanders stated that Gautro's prognosis was "fair with compliance" (Doc. 10-1, p. 551/613).

In May 2013, Dr. Quillin wrote that Gautro had schizoaffective disorder since 2011, and it was expected to last twelve months or longer (Doc. 10-1. p. 423/613).   On May 31, 2013, Dr. Quillin noted that Dr. Mo had started Gautro on Cymbalta for his pain, as well as Restoril and Clonidine for blood pressure, and that his pain and depression were stable (Doc. 10-1, p. 599/613).

On September 4, 2013, Gautro saw Dr. Quillin for complaints of depression and psychosis (Doc. 10-1, p. 601/613).   Dr. Quillin discontinued the Invega and prescribed Latuda and Cymbalta (Doc 10-1, p. 601/613).

In September 2013, Dr. Quillin wrote in a letter that Gautro was under his care for a severe psychiatric condition—schizoaffective disorder characterized by auditory hallucinations, paranoid mentation, and substantial depression with passive death wishes—that was being treated with Cymbalta 60 mg, Latuda 20 mg, and Ativan 1 mg (Doc. 10-1, p. 597/613).   Dr. Quillin further wrote that Gautro's status was poor; his social interaction was quite poor; he stayed in his room most of the time; he was fearful of being around other people; he could become quite upset and decompensate under even minimal to nominal stresses of an everyday type; he had required inpatient hospitalization on several occasions; he was unable to deal

with simple day-to-day stresses without episodic decompensation; his social interaction was "quite compromised"; and his prognosis was very guarded (Doc. 10-1, p. 598/613).

Gautro went to the emergency room in October 2013 because he may have had a seizure (Doc. 10-1, p. 604/613).  Gautro was also diagnosed with gastroesophageal reflux disease ("GERD") (Doc. 10-1, p. 605/613).  Because of the possible seizure, Dr. Quillin discontinued the Latuda (Doc. 10-1, p. 612/613).

In October 2013, Dr. Quillin treated Gautro for auditory hallucinations, confused thinking, and low-grade delusions (Dor. 10-1, p. 613/613).  Dr. Quillin continued to treat Gautro monthly (Doc. 10-1, pp. 609-612/613).  In January 2014, Dr. Quillin noted that Gautro was having racing thoughts and going for two to three days without sleeping, and they discussed the possibility of lithium therapy provided his new blood pressure medication was not an ACE inhibitor (Doc. 10-1, p. 610/613).  In the interim, Dr. Quillin increased Gautro's Haldol, gave him a prescription for Cogentin, and continued his Celexa (Doc. 10-1, p. 610/613).[3]

---

[3] Dr. Quillin wrote another letter on February 11, 2014, that was presented to the Appeals Council. Dr. Quillin stated he has been treating Gautro's schizoaffective disorder and obsessive-compulsive disorder for a while, both conditions are severe, and neither condition has ever stabilized enough to allow gainful employment (Doc. 10-1, p. 608/613).  Dr. Quillin wrote that Gautro has improved in his symptoms but not enough to allow for successful reintegration into gainful employment, and fluctuations in symptom severity is common (Doc. 10-1, p. 608/613).  Dr. Quillin stated the only appropriate evaluation of Gautro's ability to function is longitudinally as opposed to piecemeal, that Gautro is episodically, floridly psychotic, and one can reasonably anticipate that periodic deterioration and relapse will occur due to the nature and severity of his psychiatric status (Doc. 10-1, p. 608/613). Gautro's prognosis is very guarded and his current treatment consists of a combination of antidepressive, neuroleptic, and anxiolytic therapy (Doc. 10-1, p. 608/613).  Dr. Quillin stated that, in his opinion, Gautro's severe psychiatric condition precludes gainful employment at this time (Doc. 10-1, p. 608/613).

<u>2013 Administrative Hearing</u>

At his October 2013 administrative hearing, Gautro testified that he was 21 years old, right-handed, and weighed 290 plus pounds (Doc. 10-1, p. 54/613). Gautro lives with his wife (who is unemployed) and baby, and their only income is food stamps (Doc. 10-1, p. 55/613). Gautro testified that he does not drive often, and only drives if there is someone else in the vehicle in case he has a problem, but he has a driver's license (Doc. 10-1, pp. 56-57/613). Gautro and his wife have a vehicle that Gautro's wife drives (Doc. 10-1, pp. 57-58/613). Gautro testified that his parents take care of his bills (Doc. 10-1, p. 58/613).

Gautro had problems in school, had to repeat a grade, and was in special education (Doc. 10-1, p. 68/613). Gautro completed the twelfth grade in a private school that was not state-accredited (Doc. 10-1, p. 57/613). Gautro worked at Walmart for about two months, but he did not like having to do so many different kinds of tasks in so many different areas because he has difficulty remembering instructions (Doc. 10-1, p. 58, 67/613). Gautro also worked at a prison for about two days, but he had to take a test for that job and he did not pass it (Doc. 10-1, p. 67/613).

Gautro testified that he was recently hospitalized for a seizure and stomach pain, and that he had seizures before (Doc. 10-1, p. 59/613). Gautro testified that he does not smoke, drink alcohol, use illegal drugs, or abuse his prescription medicines (Doc. 10-1, p. 60/613). Gautro also testified that he takes his medications regularly because his family gives it to him, and has always done so (Doc. 10-1, p. 60/613). Gautro does not have possession of his medications (Doc. 10-1, p. 67/613).

16

Gautro testified that he is not able to help with the baby (Doc. 10-1, p. 62/613). Gautro and his wife live in a mobile home in his parents' yard (Doc. 10-1, p. 62/613). On a typical day, Gautro "just tries to feel okay," does things that make him feel okay, watches TV, and plays video games (Doc. 10-1, p. 62/613).  Gautro sometimes plays with his child, but never watches her (Doc. 10-1, p. 63/613).  Gautro's mother checks on him several times a day (Doc. 10-1, p. 66/613).  Gautro also has difficulty sleeping (Doc. 10-1, p. 68/613).  Gautro testified that he does not have any friends, and he and his wife do not go out (Doc. 10-6, p. 69/613).  Gautro goes to church on Sundays unless he feels too scared to go (Doc. 10-6, p. 69/613).  Gautro's mother and wife remind him when he has a doctor appointment (Doc. 10-1, p. 67/613).

Gautro testified that his mother takes him to see Dr. Quillin about once a month, and that he feels better after he has seen him (Doc. 10-1, p. 63/613).  Gautro had a blood clot in his arm that was treated successfully (Doc. 10-1, pp. 63-64/613).

Gautro testified that he cannot work because it is difficult for him to do things (Doc. 10-1, p. 59/613).  Gautro does not understand everything and forgets too fast (Doc. 10-1, p. 64/613).  Gautro has memory problems (Doc. 10-1, p. 68/613).  When he gets mail, Gautro gives it to his family because, although he can read the words, he does not understand them (Doc. 10-1, p. 66/613).  Gautro's mother takes care of his money (Doc. 10-1, p. 66/613).

Gautro testified that he is nice to his mother and wife, but he has loses his temper when he is fussed at too much or cursed at by his father (Doc. 10-1, p. 64/613). Gautro testified that he wishes he could be okay and do everything for his wife and

child (Doc. 10-1, p. 64/613).  Gautro thinks he went to the Louisiana Rehabilitation Service to see about being trained for a job, but nothing happened with that (Doc. 10-1, pp. 64-65/613).

Gautro testified that he "sees things," sometimes daily, but his medicine slows that down (Doc. 10-1, p. 65/613).  It was difficult for Gautro to appear for the hearing (Doc. 10-1, p. 66/613).

Gautro's mother, Arsane Gautro ("Arsane"), also testified (Doc. 10-1, p. 70/613). Arsane testified that she sees her son several times each day, Gautro married in 2011 and has an 11-month-old child, and Gautro and his family have lived in a mobile home on her property, next door to her home, since 2011 (Doc. 10-1, p. 70/613). Arsane and Gautro's wife give him his medicine (Doc. 10-1, p. 71/613).  Arsane testified that Gautro was hospitalized for a week in May at her suggestion because he had been crying too much (Doc. 10-1, p. 71/613).  After he left the hospital, Gautro's hallucinations still did not seem to be under control because, the day he left the hospital, Gautro told his mother he saw something (Doc. 10-1, pp. 71-72/613).  Arsane testified that Gautro sleeps all day and stays up all night, watching TV and playing video games (Doc. 10-1, p. 72/613).

Arsane testified that she and her Gautro's father pay all of his expenses (Doc. 10-1, p. 72/613).  Gautro's wife did not graduate from high school because she was never able to pass the exit exam (Doc. 10-1, p. 73/613).  Gautro's wife takes care of their child all day, and Arsane helps take care of her at night (Doc. 10-1, p. 73/613). Arsane works in human resources at a nursing home (Doc. 10-1, p. 73/613).  Arsane

cooks for them a little, and is teaching Gautro's wife to cook (Doc. 10-1, p. 75/613). Arsane also takes Gautro's wife grocery shopping (Doc. 10-1, p. 75/613). Arsane takes Gautro to all of his doctor appointments because Gautro cannot drive to Alexandria and his wife cannot drive through the traffic circle (Doc. 10-1, p. 76/613). Gautro's father takes care of Gautro's home maintenance (Doc. 10-1, p. 78/613).

Arsane testified that Gautro failed third grade, so she took him to a doctor who diagnosed him with a learning disorder (Doc. 10-1, p. 73/613). When Gautro failed fourth grade, Arsane put him in a Pentecostal school that used a PACE program for one-on-one teaching (Doc. 10-1, p. 74/613). Gautro finished twelfth grade and graduated from the private school, but it was not a state-accredited school (Doc. 10-1, p. 74/613).

Arsane forced Gautro to get a driver's license in an attempt to make things as normal as possible, although he did not want one (Doc. 10-1, p. 74/613). Gautro took the driver's test a few times until he passed it, and his parents bought him a car (Doc. 10-1, p. 74/613). Gautro drove the car a few months before he rear-ended someone and, after that, he preferred not to drive except to go to the store (Doc. 10-1, p. 74/613).

Arsane testified that, although Gautro failed the test to get the prison job, a relative working there had him show up for work, anyway (Doc. 10-1, p. 76/613). Gautro went to work at the prison for two days, but could not stop crying and said he could not handle it (Doc. 10-1, p. 76/613). Gautro worked at Walmart about two months, and they helped him pass the test on the computer (Doc. 10-1, p. 76/613). Arsane testified that Gautro did not go the Louisiana Rehabilitation Service because,

after they received paperwork for the program, they also received a letter telling them there were no jobs available at that time (Doc. 10-1, p. 75/613).  Arsane testified that Gautro could not work now (Doc. 10-1, p. 75/613).

Gautro has never had any problems with the police (Doc. 10-1, p. 74/613).  Gautro had one main friend when he was in school (Doc. 10-1, p. 74/613).  Arsane took Gautro to all of the youth programs at the different churches to try to help him to make friends, which is how he met his wife (Doc. 10-1, p. 74/613).

Arsane testified that, if Gautro did not live near her, he would not be able to function on his own and would have to live with someone (Doc. 10-1, p. 76/613).  Gautro has never lived independently (Doc. 10-1. P. 77/613).  Arsane testified that she occasionally has to remind Gautro to bathe, dress, and eat (Doc. 10-1, p. 77/613).  Gautro is also not capable of taking care of his child by himself (Doc. 10-1, p. 79/613).

Arsane testified that Gautro says he wishes he would just die because he does not feel good, but some days are worse than others (Doc. 10-1, p. 77/613).  On bad days, about twice a week, Gautro cries and wishes he would die and not be a problem to everyone (Doc. 10-1, p. 78/613).  Gautro's father gets frustrated with Gautro because he is not patient and does not understand that Gautro has to be told things over and over (Doc. 10-1, p. 78/613).

The VE testified that Gautro's past work at Walmart was cook-helper (DOT 317.687-010, medium work, SVP 2) (Doc. 10-1, p. 81/613).

The ALJ posed a hypothetical involving a person of Gautro's age, education, and work experience, with no exertional limitations, but non-exertional limitations

of no complex or detailed work, work involving only simple 1, 2 and 3 step instructions, a work environment with only occasional interaction with others, and working with things rather than people (Doc. 10-1, p. 81/613).  The VE testified that such a person could be a sandwich maker (DOT 317.664-010,[4] medium work, SVP 2, 1,732 jobs in Louisiana and 49,095 jobs nationally), or housekeeper (DOT 323.687-014, light work, SVP 2, 2,307 jobs in Louisiana and 133,847 nationally (Doc. 10-1, p. 81/613).   The VE further testified that neither of those jobs would expose him to hazards such as unprotected heights or dangerous machinery (Doc. 10-1, p. 81/613).

The ALJ posed a second hypothetical involving a person of Gautro's age, education, and work experience, with no exertional limitations, but non-exertional limitations of an inability to follow even simple one or two-step instructions (Doc. 100-1, p. 81/613).  The VE testified there are no jobs that such a person can do (Doc. 10-1, p. 81/613).

Alternatively, the ALJ amended the first hypothetical to add crying spells twice a week, or even just three to four days per month, which prevent the person from working on those days (Doc. 10-1, p. 82/613).  The VE testified there would not be any jobs such person could do on a sustained basis (Doc. 10-1, pp. 81-82/613).

<u>ALJ's Findings</u>

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a).  The sequential process required the ALJ to determine whether Gautro (1) is presently working; (2) has a severe

---

[4] "DOT" is the Dictionary of Occupational Titles.

impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work he did in the past; and (5) can perform any other type of work.  If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends.  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.  See Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120 (1995) (citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir.1987)).

To be entitled to benefits, an applicant bears the initial burden of showing that he is disabled.  Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis.  Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy.  See Greenspan, 38 F.3d at 237.

In this case, the ALJ found that Gautro has not engaged in substantial gainful activity since April 27, 2011 (the application date) and has severe impairments of schizophrenia, major depression, and a personality disorder, but does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Doc. 10-1, p. 19/613).  At Step No. 5 of the sequential process, the ALJ further found that Gautro has the residual functional capacity to perform the full range of work at all exertional levels, but has nonexertional limitations of: (1) work with no more than one to three-step instructions; (2) no more than occasional interaction with the public, co-workers, and supervisors; and (3) working with things

22

rather than with people (Doc. 10-1, p. 21/613).  The ALJ found Gautro is a younger individual with "at least a high school education" and no past relevant work (Doc. 10-1, p. 24/613).[5]

The ALJ concluded there are a significant number of jobs in the national economy that Gautro can perform such as sandwich-maker and housekeeper and, therefore, Gautro was not disabled as defined in the Social Security Act at any time through the date of the ALJ's decision on November 27, 2013 (Doc. 10-1, pp. 25-26/613).

<u>Law and Analysis</u>

<u>Issue 1 – Hypothetical</u>

Gautro contends the ALJ's hypothetical question to the VE was defective because he failed to include the limitations caused by Gautro's mental impairments. Gautro contends he has limitations in activities of daily living, social functioning, and concentration, persistence or pace, as set forth in the ALJ's assessment of Gautro's mental residual functional capacity[6] (Doc. 10-1, pp. 20-21/613).

---

[5] This appears to be incorrect.  Since Gautro was in special education in public school before he was placed in a non-accredited private school for children with learning disabilities, the fact that he attended school for twelve years does not indicate that he has "at least a high school education."  <u>See</u> 20 C.F.R. § 416.964.

[6] Federal regulations require that the ALJ follow mandatory steps when evaluating the severity of mental impairments in claimants, which is known as the "special technique."  <u>See</u> 20 C.F.R. § 404.1520a.  In evaluating mental disorders, the ALJ first considers whether a claimant has a medically determinable mental impairment.  <u>See</u> 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00; 20 C.F.R. § 404 .1520a(b)(1). To do so, the ALJ must specify the symptoms, signs, and laboratory findings that substantiate the presence of each impairment.  <u>See</u> 20 C.F.R. § 404.1520a(b)(1); <u>Boyd v. Apfel</u>, 239 F.3d 698, 705 (5th Cir.2001).  For most Listings, the regulations require the ALJ to evaluate the degree of functional limitation resulting from the claimant's mental impairments pursuant to criteria identified in paragraphs A, B, and sometimes C of the adult mental disorders contained in the Listings.  See 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00; 20 C.F.R. § 404.1520a(b)(2) & (c).  "Paragraph B" contains four broad functional areas: 1) activities of daily living; 2) social functioning; 3) concentration,

For cases at the hearing level, the ALJ has the responsibility for deciding a claimant's residual functional capacity.  See 20 C.F.R. § 404.1546.  The ALJ must perform a "function-by-function" assessment of the claimant's ability to engage in work-related activities when making his RFC determination.  See SSR 96-8p.  When making the RFC determination, an ALJ must consider objective medical facts, diagnoses, and medical opinion based on such facts, and subjective evidence of pain or disability testified to by the claimant or others.  See 20 C.F.R. § 404.1545(a).  Moreover, the ALJ must specify the evidentiary basis for his RFC determination.  See SSR 96-8p; Myers v. Apfel, 238 F.3d 617, 620 (5th Cir. 2001).

The Fifth Circuit has consistently held that once the ALJ determines that a claimant suffers from a nonexertional impairment that prevents him from performing his past relevant work, the Commissioner must produce expert vocational testimony or other similar evidence to establish that other jobs exist in the nation economy that the claimant can perform.  See Fields v. Bowen, 805 F.2d 1168, 1170 (5th Cir. 1986) (and cases cited therein).

The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.  A vocational expert is able to compare all the unique requirements of a specified job with the particular ailments a claimant suffers in

---

persistence, or pace; and 4) episodes of decompensation.  See 20 C.F.R. § 404.1520a(c)(3); 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00C.  The ALJ's written decision must incorporate pertinent findings and conclusions based on the technique and must include a specific finding of the degree of limitation in each of the functional areas described.  See 20 C.F.R. § 404.1520a(e)(4).

order to reach a reasoned conclusion whether the claimant can perform the specified job.  See Fields, 805 F.2d at 1171.

In Winschel v. Commissioner of Social Security, 631 F.3d 1176, 1180 (11th Cir. 2011), the Eleventh Circuit considered the issue of whether a hypothetical question to a VE must specifically account for limitation in concentration, persistence, and pace.  The Eleventh Circuit noted that some circuits have rejected the argument that an ALJ generally accounts for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work; while others have concluded the limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations; and still others have held that hypothetical questions adequately account for limitations in concentration, persistence, and pace when the questions otherwise implicitly account for these limitations.  See Winschel, 631 F.3d at 1180.  The Eleventh Circuit concluded that, where the ALJ does not indicate that medical evidence suggested a claimant's ability to work was unaffected by a limitation in concentration, persistence, and pace, and did not otherwise implicitly include the limitation in his hypothetical to the VE, the hypothetical was deficient and the VE's testimony was not substantial evidence that supported the ALJ's conclusion.  See Winschel, 631 F.3d at 1181.

The Fifth Circuit has held that a hypothetical that includes "restrictions to rare public interaction, low stress, and simple, one- to two-step instructions reflect that the ALJ reasonably incorporated [the claimant]'s moderate concentration, persistence, and pace limitations such that the hypothetical question was proper."

See Bordelon v. Astrue, 281 F. Appx. 418, 423 (5th Cir. 2008).  District courts in the Fifth Circuit have followed Bordelon and held that an RFC limited to simple work reasonably incorporates a moderate or even marked limitation in concentration, persistence, or pace.  See Ricks v. Colvin, 12-2647, 2014 WL 333911 at *8 (W.D. La. 2014) (collecting cases).

In this case, the ALJ's hypothetical included a limitation to one, two, or three-step work.  Pursuant to the Fifth Circuit's holding in Bordelon, that limitation implicitly incorporates Gautro's moderate limitation in concentration, persistence, and pace.

The ALJ's hypothetical also included a limitation to working with things rather than with people and a work environment with only occasional interaction with others.  That limitation implicitly incorporated Gautro's moderate limitation in social functioning.  Gautro has not argued specifically how the ALJ should have incorporated his moderate limitation in activities of daily living into the hypothetical.

Gautro also argues the ALJ failed to explain "moderate" mental impairment to the VE, to make sure he properly understood it when he responded to the hypothetical.  However, the ALJ did use the term "moderate functional mental impairment," or anything similar, in his hypothetical.  Since the word "moderate" was not used in the hypothetical, it did not need to be defined for the VE.

Therefore, the ALJ"s hypothetical correctly incorporated Gautro's mental limitations.

Issue 2 – Maintaining a Job

Next, Gautro contends the ALJ's determination that he can work does not comport with proper legal standards because the ALJ failed to find that Gautro can hold and maintain a job for a significant period of time.

In Singletary v. Bowen, 798 F.2d 818 (5th Cir. 1986), the twenty-nine year old claimant had a GED, a sporadic employment history, and long-term mental impairments that had been variously diagnosed as schizophrenia, psychoses, delusions, antisocial personality, inadequate personality, and passive-aggressive personality.   The Fifth Circuit noted that, unlike a physical impairment, it is extremely difficult to predict the course of mental illness.   Symptom-free intervals, though sometimes indicative of a remission in the mental disorder, are generally of uncertain duration and marked by an impending possibility of relapse.   Realistically, a person with a mental impairment may be unable to engage in competitive employment, as his ability to work may be sporadically interrupted by unforeseeable mental setbacks.   See Singletary, 798 F.2d at 821.

The court in Singletary further stated:

> A finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that he can physically perform certain jobs; it also requires a determination that the claimant can *hold* whatever job he finds for a significant period of time.   See Parsons v. Heckler, 739 F.2d 1334, 1340 (8th Cir.1984) ("the ability of a claimant to perform jobs in the national economy must take into account the actual ability of the claimant to find *and* hold a job in the real world") (emphasis added); Tennant v. Schweiker, 682 F.2d 707, 709–10 (8th Cir.1982) (where individual bases his claim on a personality disorder, "the dispute focuses on whether the claimant has the emotional capacity to engage in sustained employment").   A determination that a claimant is unable to

> continue working for significant periods of time must, however, be
> supported by more than a claimant's personal history; it must also be
> supported by medical evidence. <u>See</u> 20 C.F.R. §§ 404.1546; 404.1560.

See <u>Singletary</u>, 798 F.2d at 822.[7]

In the context of Gautro's ability to work, the ALJ discounted Dr. Quillin's opinion that Gautro is unable to deal with simple day-to-day stresses without episodic decompensation, and selectively relied on Dr. Quillin's treatment notes of February, April, and May 2013 that stated Gautro's social functioning and mood were improved and that he was not having any hallucinations (Doc. 10-1, p. 24/613). The ALJ also stated he believed Gautro was feigning illness on his mental status testing (Doc. 10-1, p. 24/613), and that, with medication compliance, Gautro could work (Doc. 10-1, p. 24/613). The ALJ did not make a determination that Gautro can maintain employment for a significant period of time.

First, Dr. Hsu, Dr. Futch, Dr. Quillin, Dr. Spurrier, Dr. Sanders, and Dr. Brouillette all found that Gautro suffers from mental illness. The medical records show that he has suffered from mental illness since childhood. Only Dr. Rambin, who made a one-time examination, thought Gautro may be feigning mental illness. It is noted the ALJ failed to review Gautro's childhood mental health records. The treating physician's opinion is entitled to more weight than that of a consulting physician who has never examined the applicant, or when the consulting physician

---

[7] In <u>Gatliff v. Commissioner of Social Security</u>, 172 F.3d 690, 693 n.3 (9th Cir. 1999), the court noted that the phrase "significant period of time" was not precisely defined by the Fifth Circuit in <u>Singletary.</u> The Fifth Circuit did not specify how long the claimant could hold a job, only that he was unable to maintain employment for "long periods of time," "significant periods of time," and "more than limited periods of time."

examined the applicant only on a "one-shot" basis.  See Bowman v. Heckler, 706 F.2d

564, 568 (5th Cir. 1984) (citing Oldham v. Schweiker, 660 F.2d 1078, 1084 (5th Cir.

1981)); Warncke v. Harris, 619 F.2d 412, 416 (5th Cir. 1980); Strickland v. Harris,

615 F.2d 1103, 1109-1110 (5th Cir. 1980); Williams v. Finch, 440 F.2d 613, 616-17 &

n. 6 (5th Cir. 1971).

Second, episodes during which a claimant's mental condition deteriorates

directly affect his ability to maintain employment.  See Watson v. Barnhart, 288 F.3d

212, 217-18 (5th Cir. 2002).   In this case, the ALJ focused on one episode of

improvement and stabilization in determining that Gautro can work and ignored the

fluctuating pattern of his illness.  There is medical evidence that Gautro has episodes

during which his mental condition deteriorates.  Failure to determine the claimant

can obtain and maintain employment is a legal error wherein the Commissioner

relied on an erroneous legal standard in assessing the evidence.  See Moore v.

Sullivan, 895 F.2d 1065, 1070 (5th Cir. 1990) (where the Secretary has relied on

erroneous legal standards in assessing the evidence, he must reconsider that denial)

(citing Leidler v. Sullivan, 885 F.2d 291, 292-93 (5th Cir. 1989), and Singletary, 798

F.2d at 822).   Since the ALJ did not determine whether Gautro can maintain

employment for a significant period of time, substantial evidence does not support

the ALJ's decision that Gautro is not disabled.

Since substantial evidence does not support the conclusions of the ALJ and the

Appeals Council, their decision is incorrect as a matter of law.  However, this does

not entitle Gautro to a decision in his favor based upon the existing record.  The record

is simply inconclusive as to whether there are any jobs existing in sufficient numbers in the national economy which Gautro can perform, given his true impairments. Therefore, Gautro's case should be remanded to the Commissioner for further proceedings.

Issue 3 – Severity of Gautro's Mental Impairments

Gautro next argues the ALJ did not follow agency regulations in assessing the severity of Gautro's mental impairments.  Gautro contends the ALJ failed to follow the regulations at Listing 12.00(C) for assessing the severity of his functional limitations.  Gautro contends he has a marked limitation in the area of social functioning.  Gautro argues the ALJ ignored the most current medical records from his treating physician, Dr. Quillin, and instead relied on old records to support his findings.

The ALJ stated that Gautro is feigning mental illness and did not believe that he has memory problems, relying on a statement by the one-time examining consultant, Dr. Rambin (Doc. 10-1, pp. 23-24/613).[8]  The ALJ used that reasoning to find that Gautro does not suffer from more than moderate functional limitations and has not had any episodes of decompensation.  Of course, the ALJ's statement that Gautro is feigning illness contradicts the finding that Gautro suffers from schizophrenia, major depression, and a personality disorder.

---

[8] The ALJ also found Gautro was admitted to the hospital in July 2011 for drinking and using "legal weed" (Doc. 10-1, p. 22/613), although there is other evidence that Gautro's toxicology screen was negative for those substances.

Gautro's childhood medical records show that his obsessive-compulsive disorder and depression began in childhood.  The ALJ made no mention of Gautro's childhood mental health records.  Since Dr. Hsu, Dr. Futch, Dr. Quillin, Dr. Spurrier, Dr. Sanders, and Dr. Brouillette all found that Gautro suffers from mental illness, the ALJ's reliance on the opinion of Dr. Rambin, who examined Gautro once, was not reasonable.

The ALJ also found that Gautro is non-compliant with his medication, based on Dr. Quillin's medical records showing Gautro's mother had not given him one of his medications in May 2013 due to adverse side effects (Doc. 10-1, p. 549, 599/613), and that had missed some appointments with Dr. Quillin between June 2012 and September 2013.   Gautro was hospitalized twice during those times, once for treatment of DVT and once because he self-admitted for six days to a mental hospital. Moreover, as Gautro points out, Gautro saw Dr. Quillin 22 times between February 2012 and January 2014, which is more than enough to indicate that Gautro was not being non-complaint with treatment.

Therefore, on remand, the severity of Gautro's mental impairments should be re-evaluated within the correct factual context and giving appropriate weight to the opinions of all of Gautro's physicians.  Any changes in functional limitations may be added to the hypothetical on remand.

Issue 4 – Interaction with Others

Finally, Gautro contends the two jobs identified by the VE require skills excluded by the ALJ's hypothetical questions.  Apparently, both jobs require social interaction with people.

According to the DOT[9] description, the job of a sandwich-maker (DOT 317.664-010)[10] includes "receives sandwich orders from customers."  The job of a housekeeper (DOT 323.687-014) includes "checks wraps and renders personal assistance to patrons."

Both jobs clearly require personal interaction with other people, which the ALJ's hypothetical specifically limited to only occasional interaction with others.[11]  It

---

[9] "DOT" is the Dictionary of Occupational Titles.

[10] The DOT states: 317.664-010 SANDWICH MAKER (hotel & rest.) alternate titles: sandwich-counter attendant:

> Prepares sandwiches to individual order of customers: **Receives sandwich orders from customers**. Slices cold meats and cheese by hand or machine. Selects and cuts bread, such as white, whole wheat, or rye, and toasts or grills bread, according to order. Places meat or filling and garnish, such as chopped or sliced onion and lettuce, between bread slices. Prepares garnishes for sandwiches, such as sliced tomatoes and pickles. May cook, mix, and season ingredients to make dressings, fillings, and spreads. May fry hamburgers, bacon, steaks, and eggs for hot sandwiches. May butter bread slices, using knife.

The DOT furthers states: **323.687-014 CLEANER, HOUSEKEEPING (any industry) alternate titles: maid**:

> Cleans rooms and halls in commercial establishments, **such as hotels, restaurants, clubs, beauty parlors, and dormitories**, performing any combination of following duties: Sorts, counts, folds, marks, or carries linens. Makes beds. Replenishes supplies, such as drinking glasses and writing supplies. **Checks wraps and renders personal assistance to patrons**. Moves furniture, hangs drapes, and rolls carpets. Performs other duties as described under CLEANER (any industry) I Master Title. May be designated according to type of establishment cleaned as Beauty Parlor Cleaner (personal ser.); Motel Cleaner (hotel & rest.); or according to area cleaned as Sleeping Room Cleaner (hotel & rest.).

[11] "Occasional" has been defined to mean up to one-third of the time.  See S.S.R. 85-15, "Titles II and XVI: Capability to do Other Work—The Medical-Vocational Rules as a Framework for Evaluating Solely Nonexertional Impairments."

is not clear what level of personal interaction those jobs require.  Although Gautro's attorney failed to raise this issue at the last administrative hearing, the issue can and should be explored on remand.

Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that the final decision of the Commissioner be VACATED and that Gautro's case be REMANDED to the Commissioner for further proceedings.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule 2(b), parties aggrieved by this recommendation have **fourteen (14)** days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14)** days after being served with a copy thereof.  No other briefs (such as supplemental objections, reply briefs etc.) may be filed.  Providing a courtesy copy of the objection to the magistrate judge is neither required nor encouraged.  Timely objections will be considered by the district judge before he makes a final ruling.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.  See Douglass v. United Services Automobile Association, 79 F.3d 1415 (5th Cir. 1996).**

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana, this _____ day of September 2016.

Joseph H.L. Perez-Montes
United States Magistrate Judge